1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT

8 EASTERN DISTRICT OF CALIFORNIA

9

10 BENITO SANCHEZ SALAS,                    No. 1:15-cv-00766-DAD-SKO HC

11        Petitioner,

12   v.                                     **FINDINGS AND RECOMMENDATION
                                            THAT THE COURT DENY PETITION
13 NEIL McDOWELL, Warden,                   FOR WRIT OF HABEAS CORPUS**

14        Respondent.                       **(Doc. 1)**

15

16        Petitioner, Benito Sanchez Salas, is a state prisoner proceeding, with counsel, with a

17 petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, Petitioner

18 presents five claims for habeas relief: (1) insufficient evidence of specific intent to kill for the

19 charge of attempted murder; (2) insufficient evidence of premeditation and deliberation for the

20 charge of attempted murder; (3) insufficient evidence of premeditation and deliberation for the

21 charge of first degree murder; (4) the first degree murder convictions were inconsistent, in

22 violation of the Fifth, Sixth, and Fourteenth Amendments; and (5) ineffective assistance of

23 counsel. Petitioner requested the Court hold an evidentiary hearing on his claims. The Court

24 referred the matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302

25 and 304. Having reviewed the record and applicable law, the undersigned recommends that the

26

27 Court deny habeas relief and decline to hold an evidentiary hearing on Petitioner's claims.

28

1

## I.      Procedural and Factual Background[1]

This case arises out of an altercation between members of two families, the Mendez family and the Salas family, who lived on the 4600 block of East Turner Avenue in Fresno. Petitioner is a member of the Salas family. The Mendez family, Maria Arceli Mendez ("Maria M.") and her husband, Jose Mendez ("Jose M."), lived at 4677 East Turner Avenue with their children. The Salas family lived two addresses directly east of the Mendez family residence. Petitioner lived in the guest house of 4681 East Turner Avenue. Petitioner's father, Alberto Salas, Sr. ("Alberto S."), his mother, Maria Nativad Sanchez ("Maria S."), and one of Petitioner's brothers lived in the main house at 4681 East Turner Avenue. Two of Petitioner's brothers, Fabian Salas ("Fabian S.") and Antonio Sanchez Salas ("Antonio S.") and a nephew lived at 4687 East Turner Avenue.

The Mendez and Salas families had been neighbors for years, but the relationship between the families began to deteriorate in late 2008 or early 2009 largely due to problems between a Mendez son and Fabian and Antonio S. On March 8, 2009, a fight broke out between Fabian S. and a Mendez son and ended with Petitioner becoming involved and hitting and kicking Jose M. The Mendez son was hospitalized after Antonio S. struck him in the head. During this fight, the police were called, but no arrests were made.

At trial, Petitioner testified that on March 8, 2009, he was sitting on his front porch and saw Fabian S. exchange words with members of the Mendez family. The individuals began fighting. During the fight, Jose M. threw a beer bottle at Petitioner, who was standing next to Alberto S, Petitioner's father, which caused Petitioner to join the fight. Petitioner knocked Jose M. down and Jose M. threatened Petitioner, stating he was going to kill Fabian S., Alberto S., Maria S., and Petitioner.

---

[1] The factual and procedural background is taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Salas*, (No. F063978) (Cal. Ct. App. Dec. 16, 2013), and review of the record.

Feeling threatened after this fight, Petitioner borrowed a gun from a friend. Petitioner stored the gun in his house, but later hid it in a cabinet in his mother's, Maria S.'s, kitchen.

After the fight, Maria M. unsuccessfully attempted to obtain a restraining order against Petitioner, Fabian S., and Antonio S. Trouble between the families continued and the Mendezes called the police on multiple occasions.

On June 11, 2009, children from both families participated in an elementary school graduation. Members of each family were present at the ceremony. After the ceremony, Fabian S. approached a Mendez son and the two began arguing. Fabian S. called the son names and threated him, telling the Mendez son he was going to kill him and he should "watch" when he got home. Maria M. called the police, and Fabian S. accused her of being a snitch.

After the graduation ceremony, Maria M. arrived home with several of her children, planning to hold a barbecue to celebrate her daughter's graduation. Fabian S. and his parents, Alberto S. and Maria S., were standing in front of the Salas home when Maria M. arrived, but did not engage with her. However, when Jose M. arrived home, Fabian S. insulted him and told him "I'm going to fuck you guys all up. You guys are done." Jose M. refused to fight with Fabian S. and told him to calm down. Maria M. called the police, who arrived, talked to both families, and left.

Once the police left, Fabian S. yelled at the Mendezes, called them names and tried to get them to come outside of their house to fight. While standing on his front porch, Fabian S. waived a gun around and told Jose M. that the gun was for him. Maria M. called the police again. Officers arrived, spoke with the Salases, and then told Maria M. everything was going to be fine, her family should continue their barbecue, and police would be patrolling the area.

The Mendezes continued their barbecue. Family members and friends arrived and entered the backyard for the barbeque. After eating, many of the Mendez family and friends moved to the front yard to talk and watch their children play.

Due to the large number of individuals involved in the events and the chaos surrounding the events on that day, witness testimony varied as to what happened once the Mendezes moved from the backyard to the front yard of the Mendez family home. The Court will summarize relevant witness testimony.

Several Mendez family members saw Petitioner's father, Alberto S., arrive at the Salas house either carrying a gun, or carrying a bag that the Mendezes suspected contained guns.[2] After Alberto S.'s arrival at the Salas family house, members of the Mendez family and the Salas family started arguing in the street. Members of the Mendez family claimed to see Antonio S. holding a gun during this argument, while others claimed to see Fabian S. holding a gun.

Juan Mendez ("Juan M.") asked for Fabian S. to put the guns down and "fight like a man." Fabian S. replied, "fine, we'll fight," and handed his gun to Antonio S. Fabian S. lunged towards Jose M., the two started fighting, and others joined in. Shortly after the fight began, shots were fired.

According to one witness, after the fight began, Petitioner shot into the air approximately four times as he walked toward the crowd. As Petitioner walked toward the street where the crowd was gathered, the Mendez family moved toward him, looking angry. The Mendez family surrounded Petitioner, he fired the gun, and two people dropped to the ground.

---

[2] According to Maria S., she, Alberto S., and one of their sons worked that day harvesting oranges. They started at 6:00 a.m. and returned in Alberto S.'s van around noon. They brought some oranges home in a plastic bag, which one of them took inside the house. Maria S. did not See Alberto S. with a bag full of guns.

By contrast, Maria M. testified her husband, Jose M., was on top of Fabian S. when Antonio S. came up and shot Jose M. and another Mendez family member, Pablo Mendez ("Pablo M."). Antonio S. then handed Petitioner the gun. Petitioner immediately began firing "at all the people." While Petitioner was firing, his mother, Maria S., yelled at her sons to kill everybody, including Maria M., and not let anybody live.

A different witness saw Fabian S. hovering over one of the Mendezes, hitting him, when Petitioner ran up with a gun. Petitioner was "shooting all over the place" as he ran.

During the shooting, a Mendez family guest, Hector Balladeres ("Hector"), retrieved his shotgun from his vehicle. Hector saw two people with guns and heard three shots, but did not see who fired them. Hector heard someone say "Shoot the mom" or "Get the mom," then saw Petitioner trying to shoot first Eulalia Mendez ("Eulalia M.") and then Juan M. Wanting to stop Petitioner from firing his gun, Hector fired his shotgun up into the air.

In sum, witness accounts varied as to whether Antonio S. shot Jose M. and Pablo M. and then handed the gun to Petitioner, or whether Petitioner shot Jose M. and Pablo M himself. Nonetheless, after Jose M. and Pablo M. were shot, witnesses saw Petitioner trying to shoot Eulalia M. and then Juan M, as the two tried to help victims of the shooting.

Eulalia M. saw Antonio S. shoot Jose M. and Pablo M. As Jose M. lay on the ground, Eulalia M. ran to him, and heard Maria S. say "kill the mother," referring to Maria M. Eulalia M. saw Petitioner pointing a gun at her. As he fired, Eulalia M. turned her head, and the shot flew by her, between her shoulder and her ear.

Juan M. was lying face down on the ground when he heard three shots and then a big boom. He looked up and saw people running everywhere and Pablo M. lying next to him. As Juan M. got up from the ground, he saw Petitioner point a gun at him. He looked away, heard a bang, and thought he was hit, but he was not. He did not remember if Petitioner specifically fired

5

at him, but Petitioner was firing towards all the people at the Mendez home. Juan M. later told police that Petitioner shot at him, but Juan M. ducked and was not hit.

Officers arrived after receiving a report of men arguing, and were led by members of the Mendez family to Petitioner, who was standing in the front yard of the Salas house, without a weapon. A gunshot residue examination that was subsequently conducted on Petitioner was consistent with Petitioner having fired a firearm.

Jose M. and Pablo M. died from their gunshot wounds. Pablo M. was shot in the left side of the head. A bullet also grazed the left side of his back. Pablo M.'s cause of death was listed as "perforation of the brain due to gunshot wound to the head." Jose M. suffered a gunshot wound to the left frontal region of his head. His cause of death was listed as "penetration of the brain due to gunshot wound to the head."

At trial, Petitioner testified that on June 11, he arrived home after running some errands and spoke to Fabian S. about the confrontation Fabian S. had with members of the Mendez family at the elementary school graduation. Later in the afternoon, Petitioner noticed a lot of male family members and friends at the Mendez house, which concerned him based on the volatile history between the two families.

That evening, Petitioner walked out of the Salas family home and saw a group of 40 people he believed were heading to the Salas family home to kill Alberto S. Petitioner also saw Fabian S. in the middle of the street with seven to eight people surrounding him. The group was arguing and appeared ready to fight. Petitioner did not see anyone with a weapon, and walked toward the group that was arguing. As Petitioner got closer to the group, he noticed a male with what Petitioner believed was a rifle, walking by the cars.[3]

---

[3] Presumably, Petitioner saw Hector Balladeres with his shotgun. At trial, Petitioner explained that he was not familiar with guns and could not distinguish between a shotgun and a rifle.

Afraid for Fabian S.'s life, Petitioner ran back to the Salas house and grabbed the gun he had previously stowed in Maria M.'s kitchen cabinet. As Petitioner ran back outside, he fired two or three shots in the air. Looking for the individual with the rifle, Petitioner saw Fabian S. being beaten up and fired at Jose M. and another individual who was kicking Fabian S. Petitioner believed he fired five or six rounds at the people beating up Fabian S., but he wasn't sure as to the exact number of times he fired, because he "was just shooting."

After firing his first five or six shots, Petitioner told everyone to get back and panned the gun so people knew he was serious. Petitioner did not want anyone around him and was looking for the man with the rifle.

As Petitioner was panning the gun, he saw the man with the rifle. The man came from behind Hector's truck, lifted the rifle, and fired it at Petitioner. Petitioner fired back three or four times in the direction of the man. Petitioner believed he may have fired one or two more shots afterwards, but did not remember firing at Eulalia M. or Juan M.

Petitioner stated if he had not started shooting, Fabian S. would have died. Petitioner did not know where Antonio S. was at the time of the shooting, but did not believe Antonio S. had a gun.

After the shooting, Petitioner ran to Antonio S.'s house and hid the gun in the back of the garage. Petitioner came back out into the front yard when police officers arrived and turned himself in.

Antonio S. testified that he was not able to attend the graduation ceremony, because he was working, so Fabian S. attended in his place. Fabian S. telephoned Antonio S. several times during the course of the day to tell Antonio S. that Fabian S. was having problems with the Mendez family.

When Antonio S. arrived home that evening, his son told him that the Mendez family was beating up Fabian S. Antonio S. grabbed his gun and ran outside. As he was running out of his house, he heard shooting. Antonio S. saw a group of people and smoke when he got outside, but did not see who was shooting or know if anybody was shot. Antonio S. threw his gun in the garage and ran away from the scene with his son. He did not stay to find out what was happening, because there were a lot of people around and he did not know who was shooting. The day after the shooting, someone told Antonio S. that the police were looking for him, so Antonio S. turned himself in to the police.

Antonio S. denied shooting anyone or passing a gun to Petitioner. Antonio S. stated that he and Petitioner "didn't talk" and did not have any kind of relationship. Antonio S. was unaware that Petitioner had a gun.

A jury convicted Petitioner of the first degree murders of Jose M. and Pablo M. (Cal. Penal Code § 187(a)); and the attempted premeditated murders of Eulalia M. and Juan M. (Cal. Penal Code §§ 187(a), 664).[4] As to the murder counts, the jury found true a multiple-murder special circumstance (Cal. Penal Code § 190.2(a)(3)). As to all counts, the jury found Petitioner personally and intentionally discharged a firearm (Cal. Penal Code § 12022.53(c)). Petitioner was sentenced to two consecutive terms of life in prison without the possibility of parole, plus two consecutive terms in prison with the possibility of parole, plus 80 years.

Antonio S. was jointly charged with Petitioner on the murder counts, and was alleged to have personally and intentionally discharged a firearm, proximately causing death (Cal. Penal Code § 12022.53(d)). Antonio S. was also charged with the attempted premeditated murder of a Mendez family friend. At Antonio S. and Petitioner's trial, the jury was unable to reach a verdict on any of the charges against Antonio S., and a mistrial was declared.

---

[4] Petitioner was acquitted of the attempted murder of a Mendez family friend.

On December 16, 2013, the California Court of Appeal for the Fifth Appellate District affirmed Petitioner's conviction. On March 5, 2014, the California Supreme Court denied Petitioner's Petition for Review.

On May 18, 2015, Petitioner, through counsel, filed a petition for writ of habeas corpus before this Court. Respondent filed a response on August 17, 2015, and Petitioner filed a reply on September 2, 2015.

## II.  Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

10

**III.** **The State Court Did Not Err in Denying Petitioner's Insufficient Evidence Claims.**

In his first three grounds for habeas relief, Petitioner alleges that the evidence adduced at trial was insufficient to support his convictions for attempted murder and first degree murder. (Doc. 1 at 25-39, 56-70.) Specifically, Petitioner contends that the evidence failed to prove Petitioner had the specific intent to kill or show premeditation and deliberation. *Id.* Respondent counters that the California Court of Appeal's rejection of Petitioner's claims was reasonable because there was evidence to support the jury's finding that Petitioner was guilty of attempted murder and first degree murder. (Doc. 10 at 9.)

**A.** **Standard of Review for Insufficient Evidence Claims**

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998). It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

**B.** **Attempted Murder – Specific Intent to Kill**

In his first ground for habeas relief, Petitioner contends that the evidence adduced at trial did not support his convictions for attempted murder because the evidence failed to prove he had the specific intent to kill. (Doc. 1 at 25-33.)

11

Pursuant to the California Penal Code, murder is "the unlawful filling of a human being . . . with malice aforethought."[5]  (Cal. Penal Code § 187(a)).  Attempted murder requires a specific intent to kill and a direct but ineffectual act toward accomplishing the intended killing.  *People v. Smith*, 37 Cal. 4th 733, 739 (2005).

### 1.  State Court of Appeal Opinion

The Court of Appeal explained "[a]n attempt to commit a crime occurs when the perpetrator, with the specific intent to commit the crime, performs a direct but ineffectual act towards its commission.  [ ]."  *People v. Salas*, (No. F063978) (Cal. Ct. App. Dec. 16, 2013), at 22 (quoting *People v. Marshall*, 15 Cal. 4th 1, 36 (1997)).  The Court of Appeal defined the requirements of attempted murder:

> Attempted murder "'requires the *specific intent to kill* and the commission of a direct but ineffectual act toward accomplishing the killing.'  [ ]."  (*People v. Smith* (2005) 37 Cal. 4th 733, 739.)  Implied malice – a conscious disregard for life – does not suffice, even though it would for murder itself.  (*People v. Stone* (2009) 46 Cal. 4th 131, 139-140; *Smith*, *supra*, at p. 739.)

> A defendant's intent is rarely provable by direct evidence.  Rather, such intent "'must usually be derived from all the circumstances, including the defendant's actions.  [ ].'"  (*People v. Smith*, *supra*, 37 Cal. 4th at p. 741.)  This is so even with respect to the intent to kill (express malice) required to convict a defendant of attempted murder.  [ ].  The California Supreme Court has explained: "[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice.  That the shooter had no particular motive for shooting the victim is not dispositive, although . . ., where motive is shown, such evidence will usually be probative of proof of intent to kill. . . . [T]he very act of firing a weapon "'in a manner that could have inflicted a mortal wound had the bullet

---

[5] The California Penal Code provides:

> malice may be express or implied.  It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.  It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

Cal. Penal Code § 188.

been on target'" is sufficient to support an inference of intent to kill. [ ]. (*Id.* at p. 742.)

> "'Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact. While reasonable minds may differ on the resolution of that issue, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [ ].' [ ]." (*People v. Gonzalez* (2005) 126 Cal. App. 4th 1539, 1552.)

*Id.* at 22-23.

The Court of Appeal analyzed the statements witnesses made to police officers, which detailed how Petitioner was shooting "*at* the victims." *Id.* at 23 (emphasis in original). Eulalia M. testified that Petitioner pointed his gun at her and fired from a distance of five to six feet away. *Id.* Eulalia M. testified that after shooting at her, Petitioner pointed the gun at Juan M.'s head, but police arrived at that moment. *Id.* Juan M. testified that Petitioner pointed a gun at him. *Id.* Although Juan M. did not recall if Petitioner fired the gun at him, he testified that Petitioner was shooting toward all the people at the Mendezes's house. *Id.*

The Court of Appeal found this evidence to be "sufficient to permit a rational trier of fact to conclude [Petitioner] specifically intended to kill Eulalia [M.] and Juan [M.]." *Id.* Petitioner argued before the Court of Appeal that the "weight of the testimonial evidence" established that he was "firing wildly, without any particular aim." The Court of Appeal found evidence supporting that scenario,

> or at least supporting the notion [Petitioner] was firing randomly into the crowd associated with the Mendezes. However, "[o]ur task is not to determine, for example, whether the *weight* of the evidence might favor [a lesser verdict] for either or both victims. Our task is to determine whether there was *sufficient* evidence by which a rational jury could decide" [Petitioner] harbored a specific intent to kill both victims. (*People v. Nazeri* (2010) 187 Cal. App. 4th 1101, 1111.)

*Id.* at 23-24 (emphasis in original).

The Court of Appeal, however, noted the California Supreme Court "has determined that a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind." *Id*. at 24. Indeed, "[a]n indiscriminate would-be killer is just as culpable as one who targets a specific person." *Id*. (quoting *Stone*, 46 Cal. 4th at 140) (internal quotation marks omitted).

The Court of Appeal held that "[t]he evidence to which [Petitioner] now points was before the jury – as was the evidence supporting a finding he specifically intended to kill Eulalia [M.] and Juan [M.]," and "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment." *Id*. (internal citations omitted). This is because "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." *Id*. at 24-25. The Court of Appeal declined Petitioner's request to reweigh evidence.

## 2. Denial of Petitioner's Specific Intent Argument Was Not Objectively Unreasonable

Petitioner contends that the evidence presented at trial was insufficient to prove he had the specific intent to kill, because after Antonio S. handed him the gun, Petitioner fired the gun "wildly, randomly, [and] in all directions." (Doc. 1 at 25.) Petitioner acknowledges that intent to kill has been found where a defendant fires a gun toward a victim at close range. *Id*. at 29 (citing *Smith*, 37 Cal. 4th 733; *People v. Ramos*, 193 Cal. App. 4th 43, 48 (2011); *People v. Woods*, 226 Cal. App. 3d 1037 (1991)). However, Petitioner argues that the forensic evidence presented at trial showed Petitioner fired wildly, without aiming at anyone. *Id*.

Petitioner is asking this Court to reweigh the evidence in favor of him. However, on habeas review, this Court does not reweigh the evidence presented at trial. Instead, the Court must review the record to determine whether a rational trier of fact could have found the Petitioner had the specific intent to kill beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

14

Witnesses testified at trial that Petitioner was shooting *at* victims. These witnesses included Eulalia M. and Juan M., who Petitioner was accused of attempting to murder. The jury was also presented with forensic evidence that showed bullets hit unoccupied vehicles at heights ranging from bumpers to windshield height, which Petitioner argues shows he was firing randomly and not at individuals. However, Petitioner's due process rights are not violated because there is contrary evidence that can be gleaned from the record. *Id*. at 326. Evidence is considered in the light most favorable to the prosecution, and it is assumed that the jury weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in a manner that supports the verdict. *Id*. at 319. When this standard is applied to this case, the Court cannot say that there was insufficient evidence to support the jury's conclusion.

The Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. For these reasons, the Court recommends denying Petitioner's claim that there was insufficient evidence to support a finding of specific intent to kill.

### C. <u>Attempted Murder and First Degree Murder – Premeditation and Deliberation</u>

In his second and third grounds for habeas relief, Petitioner argues that there was Insufficient evidence of premeditation and deliberation to convict Petitioner of murder and attempted murder. (Doc. 1.) As to the attempted murder charge, Petitioner states that if the Court finds sufficient evidence of Petitioner's intent to kill, there was not enough evidence of premeditation and deliberation for the attempted murder convictions. (Doc. 1 at 34-39.)

Under California law, first degree murder is defined, in part, as a "willful, deliberate, and premeditated killing." Cal. Penal Code. § 189.

## 1. <u>State Court of Appeal Opinion</u>

The Court of Appeal noted that in the context of murder, "premeditated means considered beforehand, and deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." *Salas*, (No. F063978), at 25 (quoting *People v. Mayfield*, 14 Cal. 4th 668l 767 (1997) (internal quotation marks omitted)).

Therefore,

> [a]n intentional killing is premeditated and deliberate if it occurred as the result of reflection rather than unconsidered or rash impulse. [ ]. However, the requisite reflection need not span a specific or extended period of time. Thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly. [ ]. (*People v. Nelson*, *supra*, 51 Cal. 4th at p. 213.) Evidence concerning motive, planning, and the manner of killing are pertinent to the determination of premeditation and deliberation, but these factors are not exclusive nor are they invariably determinative. [ ]. (*People v. Silva* (2001) 25 Cal. 4th 345, 368.) Rather, they are merely a framework for appellate review, and need not be present in any particular combination or afforded special weight. (*People v. Brady* (2010) 50 Cal. 4th 547, 562.)

*Id*. at 25-26 (internal quotation marks omitted).

The Court of Appeal determined that the evidence adduced at trial "showed a strong motive for both the murders and the attempted murders, specifically the bad blood between the Mendez and Salas families. Although perhaps not the instigator, [Petitioner] was an active participant in previous conflicts between family members." *Id*. at 26. Evidence showed that Petitioner borrowed the gun used in the shooting before the shooting and retrieved the gun from his parents' house before opening fire. *Id*. Additionally,

> [a] rational trier of fact [ ] could have found – with respect both to the murders and the attempted murders – that the gun was deliberately aimed at the victims' heads from a distance close enough to produce a mortal wound, either when the victims were not looking at the shooter (in the case of Jose [M.] and Pablo [M.]) or when they were in a position of disadvantage vis-à-vis [Petitioner] because they were trying to assist other victims or were on the ground (in the case of Eulalia [M.] and Juan [M.]).

16

*Id.* at 26-27.  For these reasons, the Court of Appeal affirmed the convictions.

### 2.  Denial of Petitioner's Premeditation and Deliberation Arguments Was Not Objectively Unreasonable

Petitioner contends that the confrontation between the two families on the day of the shooting was spontaneous; therefore, the evidence cannot show premeditation and deliberation on the part of Petitioner to satisfy the requirements of attempted murder or first degree murder. (Doc. 1 at 36-39, 59-69.)  Petitioner argues he fired his gun "in an uncalculated, frenzied response to the chaos[,]" and Petitioner's "behavior defied the particularized and exacting conduct characteristic of a calculated design to insure death." *Id*. at 38.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found premeditation and deliberation in this case. *Jackson*, 443 U.S. at 319.  As the Court of Appeal observed, Petitioner participated in the conflicts between the two families.  Prior to the shooting, Petitioner borrowed the gun that was used in the shooting to protect his family. On the day of the shooting, Petitioner admitted to retrieving the gun from where he hid it and opening fire on the crowd outside the Salas family house.  Further, there was evidence that Petitioner aimed the gun at his victims' heads.

While Petitioner presents evidence that the murders and attempted murders were the product of provocation, specifically seeing Fabian S. being beaten up, rather that premeditation, the Court is not permitted to reweigh the evidence.  On federal habeas review, it is the Court's job to decide whether, construing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

As the Court of Appeal noted, premeditation does not requires an extended period of time.  *Salas*, (No. F063978), at 27.  A reasonable juror could find that arming oneself with a gun and pointing that gun at individuals indicates premeditation and deliberation.  Accordingly, the

17

state court's adjudication was objectively reasonable and the Court recommends rejecting Petitioner's claim of insufficient evidence.

## IV.   The State Court Did Not Err in Rejecting Petitioner's Inconsistent Verdict Claim

In his fourth ground for habeas relief, Petitioner claims that his murder convictions were "unreliable," because the prosecution argued Petitioner aided and abetted Antonio S. in the murders of Jose and Pablo M., but the jury deadlocked on the charges against Antonio S.  (Doc. 1 at 40.)  Petitioner maintains the trial court should have "refused the verdicts" as to Petitioner "to insure the homicide verdicts rested on a lawful theory of liability, as required by the Fifth, Sixth, and Fourteenth Amendments."  *Id.* at 40-41.  Petitioner is arguing that the verdicts on the murder charges were inconsistent because he could not have aided and abetted Antonio S. in committing the murders when the jury deadlocked on Antonio S.'s guilt.

### A.  Standard of Review for Inconsistent Verdict Claims

The Due Process Clause of the Fourteenth Amendment requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."  *Jackson*, 443 U.S. at 316.  However, an inconsistent verdict does not mean that a conviction is unconstitutional.  *United States v. Powell*, 469 U.S. 57, 65 (1984).  This is even the case with an individual convicted as an aider and abettor when the principal was acquitted.  *See Standefer v. United States*, 447 U.S. 10, 20 (1980) (dictum) ("[A]ll participants in conduct violating a federal criminal statute are 'principals.'  As such, they are punishable for their criminal conduct; the fate of other participants is irrelevant.")

## B.  State Court of Appeal Opinion

At trial, the prosecutor's theory of the case was Antonio S. was the actual shooter and Petitioner aided and abetted him in the murders.  *Salas*, (No. F063978), at 28.  By contrast, Petitioner proceeded on the theory that Petitioner acted alone in killing Jose M. and Pablo M. Petitioner argued, however, the killings were either justified because they were committed in defense of a family member or constituted no more than voluntary manslaughter.  *Id.*

The jury instructions informed jurors:

> a person is guilty of a crime whether he or she committed it personally, or aided and abetted the perpetrator, and they were instructed on all applicable theories of liability with respect to [Petitioner].  They were not told the direct perpetration instructions applied only to Antonio [S.] and the aiding and abetting instructions only to [Petitioner].  Rather, they were told that, with specified exceptions not pertinent here, all instructions applied to each trial defendant.  Jurors deadlocked on all charges against Antonio [S.], and the trial court declared a mistrial as to him.  The court subsequently accepted verdicts with respect to [Petitioner]; as previously described, the jury found him guilty of first degree murder for both homicides.

*Id.* at 28-29.

Before the Court of Appeal, Petitioner argued that the jury's deadlock as to Antonio S. rendered the homicide verdicts against Petitioner unreliable.  *Id.* at 29.  Petitioner contended that once the jury deadlocked, aiding and abetting was no longer a proper theory of liability as to Petitioner and the trial court should have "refused the verdict."  *Id.*  He reasoned that if "there was no homicide committed by Antonio [S.], there was no predicate act committed by Antonio [S.] and, hence, [Petitioner] could not have aided and abetted Antonio [S.]"  *Id.*  Petitioner believed that the aider and abettor theory of liability should have been withdrawn from the jury's consideration.  *Id.*

The Court of Appeal noted,

> [i]nconsistent verdicts – whether on separate charges against one defendant or with respect to codefendants in a joint trial – are not rendered unreliable, or otherwise infirm, by virtue of their inconsistency.  Moreover, although the jury

19

must unanimously agree the defendant is guilty of a specific crime, as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, [the jury] need not decide unanimously by which theory he is guilty. More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator. This rule of state law passes constitutional muster. Not only is there no unanimity requirement as to the theory of guilty, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other.

*Id*. at 30 (internal citations and quotation marks omitted).

A trial court has a duty to instruct a jury on "general legal principles raised by the evidence and necessary for the jury's understanding of the case." *Id*. (internal citation and quotation marks omitted). Specifically with an aiding and abetting theory of liability, an instruction must be given "when such derivative culpability forms a part of the prosecution's theory of criminal liability and substantial evidence supports the theory." *Id*. at 30-31 (internal citation and quotation marks omitted). Here, the Court of Appeal found, based on the evidence, the trial court had "a sua sponte duty to instruct [the jury] on aiding and abetting liability as a general legal principle raised by the evidence and necessary for the jury's understanding of the case." *Id*. at 30 (internal citation and quotation marks omitted). The Court of Appeal determined, based on the evidence in this case, it was appropriate for the trial court to instruct the jury on an aiding and abetting theory of liability.

California Penal Code § 1161 provides "[w]hen there is a verdict of conviction, in which it appears to the Court that the jury may have mistaken the law, the Court may explain the reason for that opinion and direct the jury to reconsider their verdict. . . ." However, apart from this circumstance, "a trial court may not decline to accept a jury verdict, or refuse to hear the verdict, simply because it is inconsistent with another verdict rendered by the same jury in the same case." *Salas*, (No. F063978), at 31 (internal citations and quotation marks omitted). The Court of

Appeal determined that in this case there was no suggestion that the jury mistook the law.  *Id.*

Further, the Court of Appeal determined that the jury's deadlock on the charges against Antonio [S] did not "somehow transform aiding and abetting into an improper theory as to [Petitioner].  Jurors were not constrained by the fact the prosecution chose to focus on a particular theory."  *Id.* (internal citations omitted).  The jurors found Petitioner unanimously guilty of murdering Jose [M.] and Pablo [M.].  *Id.*  Whether an individual juror believed Petitioner was guilty as the direct perpetrator or as an aider and abettor is inconsequential.  *Id.*

If the trial court had refused the verdicts on the homicide and instructed the jury to deliberate again on only the theory that Petitioner was the direct perpetrator, it "would have given [Petitioner] a windfall to which he was not entitled.  It would have had the effect of requiring juror unanimity on [one] theory, when the law does not require such unanimity."  *Id.* at 34.  For these reasons, the Court of Appeal found the trial court did not err in failing to "refuse the verdict."

## C.  **Denial of Petitioner's Inconsistent Verdict Claim Was Not Objectively Unreasonable**

Petitioner contends that his convictions on the murder charges were inconsistent with the jury's acquittal of Antonio S. on his murder charges.  (Doc. 1 at 41.)  Petitioner states that because the prosecutor argued that Petitioner aided and abetted Antonio S. in the murders, Petitioner could not be guilty of aiding and abetting once the jury deadlocked on Antonio S.'s guilt.  *Id.*  Petitioner contends the trial court should have "refuse[d] to accept the homicide verdicts as to [Petitioner], reinstruct[ed] the jury to ignore the aiding and abetting instructions, and direct[ed] the jury to deliberate under the corrected instructions."  *Id.* at 46.

"[I]t is well established that inconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support a guilty verdict."  *United States v. Suarez*, 682 F.3d 1214, 1218 (9th Cir. 2012) (quoting *United States v.*

*Guzman*, 849 F. 2d 447, 448 (9th Cir. 1988)) (internal quotation marks omitted). As discussed, *supra*, the evidence in this case was sufficient to support a guilty verdict on the murder charges, as Petitioner admitted to shooting the victims and witnesses identified Petitioner as the shooter.

While Petitioner admits that a jury is not required to agree on a theory of liability – whether Petitioner was the actual perpetrator or an aider and abettor – Petitioner argues that this is not the usual case of inconsistent verdicts, because the prosecutor specifically alleged that Petitioner was not the primary shooter, but instead, aided and abetted Antonio S. (Doc. 1 at 49.) Despite Petitioner's claim, however, he continues to rely on the argument that the verdicts were inconsistent because the prosecution's theory was that Antonio S. was the shooter and Petitioner aided and abetted Antonio S. *Id*. at 50. "Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty . . . is immaterial. Juries may indulge in precisely such motives or vagaries." *United States v. Dotterweich*, 320 U.S. 277, 279 (1943). As the Court of Appeal noted, the jurors found Petitioner guilty of murder and it does not matter under which theory of liability they found Petitioner guilty. The jury instructions did not delineate which instructions applied to Petitioner and which applied to Antonio S.; therefore, the jury could have reasonably concluded that Petitioner was the perpetrator.

For these reasons, the evidence presented to the jury, viewed in the light most favorable to the government, was sufficient for a rational trier of fact to find Petitioner guilty of murder. The Court recommends that Petitioner's inconsistent verdict claim be denied.

**V.      The State Court Did Not Err in Rejecting Petitioner's Ineffective Assistance of Counsel Claim**

In his fifth ground for habeas relief, Petitioner contends his trial counsel provided ineffective assistance of counsel by failing to "correct" the jury instructions after the jury deadlocked on the murder charge for Antonio S. (Doc. 1 at 48.) Petitioner states "defense

counsel let [Petitioner] suffer a verdict likely based on the incorrect theory of law that he aided and abetted Antonio [S.] in the commission of the homicides." *Id.*

## A. Standard of Review for Ineffective Assistance of Counsel Claims

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The *Strickland* test requires Petitioner to establish two elements: (1) his attorney's representation was deficient and (2) he suffered prejudice as a result of the deficient representation. Both elements are mixed questions of law and fact. *Id.* at 698.

These elements need not be considered in order. *Id.* at 697. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

## B. State Court of Appeal Opinion

Petitioner argued that if the Court of Appeal found the trial court did not err in failing to "refuse the verdict" on first degree murder, the Court should find that Petitioner's counsel was ineffective for not objecting to the verdict. The Court of Appeal held:

> [i]n light of our conclusion [regarding the first degree murder verdict], [Petitioner's] alternative claim – that, if the trial court had no sua sponte obligation to take corrective action, then defense counsel was ineffective for not doing so – fails. [Petitioner] can show neither deficient performance nor prejudice, both of which he would have to establish in order to prevail on this claim. (*People v. Cunningham* (2001) 25 Cal. 4th 926, 1006; *People v. Pope* (1979) 23 Cal. 3d 412, 425; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694).

*Salas*, (No. F063978), at 35.

### C. Rejecting the Ineffective Assistance of Counsel Claim Was Not Objectively Unreasonable

Petitioner maintains trial counsel was ineffective for failing to request that the jury deliberate on the murder charge again after the jury was unable to arrive at a verdict regarding the murder charge against Antonio S. However, the jury was properly instructed on the law and unanimously determined that Petitioner was guilty of first degree murder. "Failure to raise a meritless argument does not constitute ineffective assistance of counsel." *Boag v. Raines*, 769 F.3d 1341, 1344 (9th Cir. 1985) (citing *Cooper v. Fitzharris*, 551 F.2d 1162, 1166 (9th Cir. 1977)); *see also Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance."). Because Petitioner's claim is meritless, the Court recommends denying Petitioner's ineffective assistance of trial counsel claim.

### VI. The Court Recommends Declining to Hold an Evidentiary Hearing

Petitioner requests the Court hold an evidentiary hearing. In habeas proceedings, "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998). "It is axiomatic that when issues can be resolved with reference to the state court record, an evidentiary hearing becomes nothing more than a futile exercise." *Id.* at 1176. Here, all of Petitioner's claims can be resolved by reference to the state court record. Accordingly, the Court recommends denying Petitioner's request for an evidentiary hearing.

## VII. Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B)  the final order in a proceeding under section 2255.
>
> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his  . . .

25

part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Accordingly, the Court should decline to issue a certificate of appealability.

**VIII.** <u>**Recommendations and Conclusions**</u>

Based on the foregoing, the undersigned recommends that the Court dismiss the petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C  636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned Objections to Magistrate Judge's Findings and Recommendations. Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated: __**March 30, 2018**__                    _____/s/ *Sheila K. Oberto*_____
                                         UNITED STATES MAGISTRATE JUDGE